FILED

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA       2014 DEC -4 A 10: 14

Alexandria Division                         CLERK US DISTRICT COURT
                                            ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES SECURITIES ) | CIVIL NO. 1:14CV1643 |
| AND EXCHANGE COMMISSION ) | GBL/IDD |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| MATTHEW CARLEY ) | |
| ) | |
| Defendant. ) | |
| ) | |

## COMPLAINT

Plaintiff, United States Securities and Exchange Commission (the "Commission"), alleges for its Complaint as follows:

### SUMMARY OF ALLEGATIONS

1. This action concerns a type of securities fraud known as a "pump and dump." A Defendant illegally perpetrates a "pump and dump" of securities when that Defendant (i) gains control of a substantial portion of an issuer's stock, (ii) after positioning his stock for immediate sale, arranges for the broad dissemination of materials touting that stock and (iii) proceeds to sell his shares following the touts' dissemination, and into the share price and volume increases triggered by those touts – with fraud and deception characterizing each phase.

2. By June 2009, Defendant Matthew Carley had gained control of the free-trading shares of Red Branch Technologies, Inc. ("Red Branch"), an Ashburn, Virginia-headquartered company purportedly in the airport security industry. Carley then proceeded to orchestrate two "blast email" campaigns promoting Red Branch's stock: the first in September 2009 and the

second in November-December 2009. Carley timed both campaigns to coincide with materially false and misleading company press releases which he also orchestrated. The materials disseminated during these "blast email" campaigns said things like, "[Red Branch] offers a unique set of security products for military and law enforcement purposes ... [and] can deploy these solutions today" – when in fact, as Carley well knew, Red Branch had no genuine operations and could not actually deliver any of the services it promised. Both touting "blast email" campaigns generated dramatic increases to Red Branch's share price and trading volume. Carley immediately exploited these rises to sell more than 7 million Red Branch shares, realizing $789,478 in unlawful profits.

3. By engaging in this conduct, Carley violated the anti-fraud provisions of the federal securities laws, and will continue to do so unless enjoined by this Court. Accordingly, the Commission seeks injunctive relief, disgorgement of ill-gotten gains, prejudgment interest, civil penalties, and other appropriate and necessary equitable and ancillary relief.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to Securities Act of 1933 ("Securities Act") Sections 20(d)(1) and 22(a) [15 U.S.C. § 77t(d)(1) and 77v(a)] and Securities Exchange Act of 1934 ("Exchange Act") Sections 21(d), 21(e), and 27 [15 U.S.C. §§78u(d), 78u(e), and 78aa] and 28 U.S.C. § 1331.

5. Venue is proper in this Court pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa] because certain of the acts, practices, transactions and courses of business constituting the violations alleged herein occurred within the Eastern District of Virginia.

6. Carley, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails or of the facilities of a national securities exchange, in connection with the acts, practices and courses of business alleged in this Complaint.

## THE DEFENDANT

7. Matthew Carley, age 44, is a resident of Bozeman, Montana. At all relevant times, Carley operated Carley Enterprises, through which he acquired control of the shell company that ultimately became Red Branch.

## ISSUER

8. Red Branch Technologies, Inc. is a Delaware corporation with its principal place of business in Ashburn, Virginia. Since at least 2009 its shares have been quoted on the over-the-counter markets (i.e. "Pink Sheets"), trading under the symbol RBTI. The company was formed in 1987 as Chase Medical Group. In 2007, it underwent a reverse merger (whereby a privately held company becomes publicly quoted through acquisition by a publicly quoted shell company), that was engineered by Carley, and that resulted in its becoming Red Branch Technologies, Inc. After the reverse merger, Red Branch initially purported to offer travel agent software. By 2009, its purported business had changed to that of offering airport-security and related homeland security-related technology. At all relevant times, the company has not been subject to Exchange Act reporting pursuant to Sections 13(a) or 15(d) [15 U.S.C. §§ 78m(a) or 78o(a)].

## FACTS

9. In April 2007, Carley – acting through his Carley Enterprises entity – signed an agreement with a private corporation called Red Branch Technologies of Nevada Inc. ("RB-Nevada"), providing that Carley would, in return for stock and other consideration, find a public shell company with which RB-Nevada could combine. By the following month, Carley had

3

found such a public shell: Chase Medical Group Inc., which was then quoted on the Pink Sheets under the symbol CTOG. Immediately following the merger, Chase Medical's name and ticker symbol were changed, respectively, to Red Branch Technologies, Inc. and RBTI; and Carley received shares of the new company and continued to act as a consultant for it.

10. Following the merger, Carley held 8.75 million unrestricted shares, and 1.5 million restricted shares, of Red Branch. (Restricted shares, unlike unrestricted shares, may not be offered and sold in interstate commerce without being registered with the Commission, unless an exemption from registration applies.) Carley's free unrestricted shares represented approximately 40% of Red Branch's total unrestricted shares outstanding. On May 29, 2008, Carley obtained an additional 10 million shares of Red Branch.

11. The original purported business plan of Red Branch was the creation and marketing of travel agent software. In June 2009, under Carley's direction, Red Branch shifted its purported business plan to airport-security and homeland security-related technology. As Carley well knew, however, at all times relevant to the conduct at issue, Red Branch had no true business operations and no sales revenue.

12. Following the purported business shift, Carley took steps to restrict the ability of shareholders not affiliated with the scheme to remove restrictions on their Red Branch stocks. On July 1, 2009, Carley emailed officers of Red Branch and requested shareholder and stock position reports. Carley also instructed a Red Branch officer to contact the company's transfer agent and insist that all requests from shareholders to remove restrictions of Red Branch stock be approved by the company's attorney. These steps effectively eliminated the ability of individuals not affiliated with Carley's scheme to sell their stock because their stock would remain "restricted."

13. On July 29, 2009, Carley emailed officers and directors of Red Branch to report on a meeting he held with an investor relations firm. He also suggested Red Branch hire a particular firm to design its website. On September 10, 2009, Carley wired $4,400 to this firm from his personal brokerage account.

14. On September 17, 2009, Carley wired $10,000 from his personal brokerage account to Red Branch's attorney in order to pay a debt owed to the attorney by Red Branch.

15. Between September 17 and 23, 2009, and again between November 11 and December 1, 2009, Red Branch was the subject of materially misleading blast email and Internet promotional campaigns, each of which coincided with the dissemination of materially misleading Red Branch press releases.

16. Carley coordinated all of this activity, funded it in part from his own accounts, and promptly exploited its inflationary effects on Red Branch's share price and trading volume by massively selling his Red Branch shares.

17. The press releases during both campaigns were disseminated by an investor relations firm that Carley had caused Red Branch to hire, and to which Carley himself wired $3,500 on September 18, 2009, the day after the first press release was issued. All of the press releases during the two campaigns contained materially misleading statements exaggerating the company's capabilities. Several of them stated, for example, that the company "provides sustainable-energy-powered solutions meeting commercial, industrial, municipal and federal requirements for site security, materials control, emergency communications, water purification, and similar on-site applications." Others claimed that the company "offers a unique set of security products for military and law enforcement purposes" and that it "can deploy these solutions *today* for many different applications that require mobility, extended deployment and a

wide range of applications [emphasis added]." In fact however, as Carley well knew, Red Branch had never sold a single unit, and lacked the ability to actually deliver one meeting such standards.

18. Coordinated with the press releases just described were massive email blasts and Internet promotions touting Red Branch's stock which Carley likewise both orchestrated and helped to fund from his own accounts. The primary stock promoter that Carley engaged for these campaigns was a media firm that Carley paid clandestinely through a third party. In the touts' disclaimers, the media firm was represented to be the sole paying party; no disclosure was made anywhere in the touts of (i) Carley's role in funding them, (ii) his significant ownership of Red Branch stock which he had positioned to sell; or (iii) his plans to immediately sell his Red Branch shares into any price and volume rises generated by the touts. Moreover, the touts repeated the materially misleading claims in the press releases, described above, with whose dissemination Carley timed the email blasts and Internet promotions to coincide.

19. The press-releases and email blasts/Internet-promotion combinations had a dramatic effect on Red Branch's share price and trading volume. Carley's September campaign increased Red Branch's share price from $.04 to a high of $.14 on volume of more than a million shares; while Carley's November-December campaign increased Red Branch's share price above $.16 on volume in excess of 40 million shares. Carley exploited these fraud-induced increases by selling more than 7 million shares of Red Branch for unlawful profits of $789,478.

## FIRST CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES
(Violations of Section 17(a) of the Securities Act)

20. Paragraphs 1 through 18 are realleged and incorporated by reference.

6

21. By engaging in the conduct described above, Carley, directly or indirectly, in the offer or sale of securities, by the use or means or instruments of transportation or communication in interstate commerce or by the use of the mails:

    (a) employed devices, schemes, or artifices to defraud;

    (b) obtained money or property by means of untrue statements of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    (c) engaged in transactions, acts, practices and courses of business which operated as a fraud upon purchasers of securities.

22. By reason of the foregoing, Carley violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
### (Violations of Section 10(b) of the Exchange Act Section and Rule 10b-5 thereunder)

23. Paragraphs 1 through 21 are realleged and incorporated by reference.

24. By engaging in the conduct described above, Carley, directly or indirectly, by the use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities:

    (a) employed devices, schemes, or artifices to defraud;

    (b) made untrue statements of material fact, or have omitted, or are omitting and are about to omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) engaged in transactions, acts, or practices and courses of business which operated or would operate as a fraud upon purchasers of securities.

25. By reason of the foregoing, Carley violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

(i) Issue findings of fact and conclusions of law that the defendant committed the violations charged herein;

(ii) Grant a final judgment of permanent injunction restraining and enjoining Carley and his agents, servants, employees, attorneys-in-fact, and all persons in active concert or participation with them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 10(b) [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5];

(iii) Order Carley to disgorge the ill-gotten gains from the violations alleged herein, plus prejudgment interest thereon;

(iv) Order Carley to pay civil penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

(v) Grant such other and further relief as the Court may deem just, equitable and necessary; and

(vi) Retain jurisdiction over this action in order to implement and carry out the terms of all orders or decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

December 4, 2014
Washington, D.C.

Respectfully submitted,

*[signature]*

Sarah M. Hall (VA Bar No. 71084)
Stephen L. Cohen
J. Lee Buck, II
Christopher R. Mathews

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
100 F. Street, N.E
Washington, D.C. 20549
Telephone: (202) 551-4784 (Hall)
Facsimile: (202) 772-9228
halls@sec.gov